## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| ANITA Y. SCHAFFER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CV-04-RRA-2920-NE |
| | ) | |
| UNUM LIFE INSURANCE COMPANY | ) | |
| OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION
(Re Unum Life's Motion for Partial Summary Judgment, ct. doc. 15)

## I.    INTRODUCTION

This is a civil action filed by the plaintiff, Anita Y. Schaffer, against the defendant,

Unum Life Insurance Company of America.  The complaint alleges breach of contract (count

I), and bad faith refusal to pay (count II).  Before the court is defendant Unum Life's motion

for partial summary judgment on the plaintiff's claim of bad faith refusal to pay a claim

presented under Unum's group long-term disability insurance policy that was made available

to the plaintiff through her employment with the Cullman County Board of Education.  (Doc.

15).

## II.    STANDARD OF REVIEW

In conducting [a summary judgment analysis], [the Court must] view all
evidence and factual inferences in the light most favorable to the nonmoving party.
*Id.* Summary judgment is proper where "there is no genuine issue as to any material
fact" and "the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P.
56(c). However, "the mere existence of *some* alleged factual dispute between the
parties will not defeat an otherwise properly supported motion for summary
judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S.Ct. 2505,
2510, 91 L.Ed.2d 202 (1986). Only factual disputes that are material under the

substantive law governing the case will preclude entry of summary judgment. *Id.*

*Lofton v. Secretary of Dept. of Children and Family Services,* 358 F.3d 804, 809 (11th Cir. 2004).

## III.    FACTS[1]

### A.    General Background

Plaintiff  Schaffer was employed by the Cullman County Board of Education as a fourth grade elementary teacher.  She had been a schoolteacher with the Cullman County School System since August 1, 1996.  Prior to applying for insurance, Ms. Schaffer had a history of muscle pain, fatigue, and depression.  These symptoms were attributed by various treating physicians to celiac disease, osteoporosis, and, later, certain viral illnesses.  Celiac Disease is an autoimmune disease that interferes with gluten ingestion. It causes hypersensitivity or intolerance of foods that contain gluten.  According to Dr. Bostick and the Celiac Disease Foundation, side effects of celiac disease include abdominal pain, chronic diarrhea, abdominal cramping,  gas, dental enamel effects, osteopenia or osteoporosis, bone or joint pain, fatigue, weakness, lack of energy, infertility, depression, and ulcers. Osteoporosis is "thinning of the bones" due to the inability to absorb calcium and fat.  Ms. Schaffer described her celiac disease as "about to die from mal-nourishment because her body was not absorbing any nutrients."  She stated she was extremely tired, sick, vomited, and had severe constipation.

Ms. Schaffer testified that, although the symptoms never completely went away until

---

[1]The facts are construed in the light most favorable to the non-movant.  In some cases, disputed facts will be noted in a footnote.

some time in 2002, she controlled her celiac disease through a strictly regimented diet, wherein she avoided foods and products containing "gluten," such as wheat, rye, barley, and oats, or any derivative or by-product of those items.

### B.    Medical History

On August 30, 2002, the Plaintiff saw Dr. Lynn Cochran, a gastroentrologist, for a follow-up visit regarding her celiac disease. On that day, Schaffer had complaints of constipation, fatigue, increased insomnia, and arthralgias (joint pain). Dr. Cochran would later write a "To Whom it May Concern" letter concerning his observations and treatment which Ms. Schaffer submitted to Unum. Dr. Cochran's letter stated that:

> Celiac sprue [as well as any other chronic inflammatory condition of the GI tract] can produce arthralgias as a secondary event and it can produce symptoms of fatigue [as well as any other chronic inflammatory event in your body]. I would attribute your [Shaffer's] symptoms of fatigue and arthralgias could be primarily a result of celiac sprue and I did note that after your evaluation, the Mayo Clinic, they were concerned that you may have an underlying situational depression [which is probably aggravated by the celiac sprue] and is under treatment as well. In summary, after reviewing your chart, I find no evidence to substantiate a diagnosis of fibromyalgia.

On September 13, 2002, the Plaintiff visited Dr. Greg Bostick. The Plaintiff reported to Dr. Bostick that:

> Her main problem … is her profound fatigue. ... At times, she has to stay in bed all weekend and sleep an extra 5-6 hours plus her regular night's sleep. She can't get to work somedays [sic] because she just can't get out of bed and go. If she works, by lunchtime she is fatigued, she's not doing an adequate job, she doesn't think of teaching because of that. She even has a student teacher with her this year that helps some but that's not keeping her from feeling profoundly fatigued, when she gets home a little after 3:00 she has to just go and lay down for several hours …. She just doesn't think she can continue in this present regimen.

Dr. Bostick noted diffuse tenderness in the Plaintiff's abdomen. The Plaintiff indicated at that time that she was even considering visiting the Mayo Clinic because "she was just feeling so

terribly bad."

Due to the chronic and continuing nature of the Plaintiff's reported symptoms, Dr. Bostick "discussed with [the Plaintiff] her possibility of going ahead and filing for disability…." Ultimately, Dr. Bostick concluded that "I don't think she can maintain her work schedule as a full-time elementary teacher, she really needs to look at some other alternatives[;] [u]nfortunately, she probably is truly disabled and will not be able to continue gainful employment unless something happens." According to Dr. Bostick's notes, Ms. Schaffer complained of chronic pain.

Dr. Bostick wrote Unum on July 11, 2003, and informed them that this was related to a viral syndrome. Dr. Bostick told Unum that he reached this conclusion because of the fact that the plaintiff's symptoms were preceded by an "upper respiratory infection consistent even with some cold sores on her lips that would have been indicative of a viral illness." He further explained to Unum that:

> Ms. Schaffer progressed into a different set of symptoms with more specific atrophy with tender joints, with profound changes in her ability to do things to the point that after being seen at the Mayo Clinic with new symptoms, she was diagnosed with Chronic Fatigue Syndrome . . .

*Bostick Letter of August 20, 2003*, at 1.

In October or November 2002, the Plaintiff reported that her chronic fatigue and pain, which were already considered "disabling" by Dr. Bostick, allegedly became "worse." Dr. Bostick, however, reported no such increase.

Ms. Schaffer eventually did leave work due to Schaffer's diagnosis of fibromyalgia on March 7, 2003. Plaintiff later returned to work in the teaching profession in August of 2005,

after taking part in a new drug regiment that has allowed her to function on a more normal basis.

The Plaintiff's disabling fatigue and pain would ultimately be diagnosed as fibromyalgia, which, unlike celiac disease, is a non-specific illness that is simply a catchall diagnosis of exclusion for people that have chronic pain.[2] As a diagnosis of exclusion, there is no blood test or similar diagnostic test for it, and it does not appear on any x-ray. In order to obtain a diagnosis of fibromyalgia, a patient must test positive for 11 of 18 trigger points on the body when touched with a finger. That test, however, is not very accurate, and a patient can be diagnosed with fibromyalgia only after all other potential causes of the patient's symptoms have been ruled out. As a result, a patient may generally fail to respond to the "usual course of medicine" for some period of time before that patient is diagnosed with fibromyalgia.

In this case, Dr. Bostick did not initially contemplate the possibility that the Plaintiff might have fibromyalgia because her symptoms looked like they were attributable to other possible illnesses, such as her Celiac Disease. Accordingly, Dr. Bostick never checked the Plaintiff's tender points and made no effort to reach an excluded diagnosis of fibromyalgia. Dr. Bostick stated that a diagnosis of fibromyalgia did not enter into his differential at that point. *Bostick Deposition*, at 19. Accordingly, Dr. Bostick simply prescribed the Plaintiff an antiviral medicine. Dr. Krell, a Unum in-house physician, admitted that no one from Unum had conducted an independent medical examination to see if Schaffer had a diagnosis of

---

[2]Other symptoms of fibromyalgia include insomnia, fatigue, headaches and depression.

fibromyalgia at any point in time other than March of 2003.

On January 30, 2003, the plaintiff presented to Dr. Bostick complaining of flu-like symptoms.  Dr. Bostick treated the plaintiff and assessed her as having "Influenza [. . . ] Nasopharyngitis [. . .] Viral syndrome[.]" *Unum Claim File*, at 155.  On January 31, 2003, the plaintiff presented to Birmingham Obstetrics/Gynecology complaining of pelvic pain. *Unum Claim File*, at 162.  Her symptoms were treated as relating to her celiac disease.  *Id.*, at 163.  On February 5, 2003, the plaintiff had an upper GI endoscopy performed.  *Id.*, at 210.  The diagnosis was celiac sprue.  *Id.*, at 213.

After many months of not responding to the usual course of medicine, see *Bostick Deposition*, at 42 ("We just weren't getting her better"), the Plaintiff finally sought assistance at the Mayo Clinic.  After undergoing numerous tests and examinations to rule out potential issues, *see Unum Claim File*, at 54-63, 167-195, the Mayo Clinic ultimately diagnosed the Plaintiff as suffering from fibromyalgia.  The Plaintiff promptly submitted a claim for disability benefits, claiming to be unable to work due to "extreme fatigue, body aches, and difficulty sleeping." *Unum Claim File*, at 49.  After her disability insurance became effective, the Plaintiff continued to report generalized myalgias and arthralgias.

C.    Claims Process

Unum received Anita Schaffer's claim for disability benefits on April 21, 2003.  Unum assigned Michael Duffy to initially handle the case.  Duffy's background as a "claims specialist" included obtaining an Associate's Degree (2-year degree) in Business Administration at the University of Southern Maine. Thereafter, he went to work for the American Automobile Association (AAA).  He was a travel consultant for AAA for an unspecified period of time and

6

then eventually was promoted to Director of Operations. Thereafter, he worked for a publishing company in Portland, which published or edited supplemental education materials.

Duffy testified that the only medical training he received from Unum came via "seminars," which would last between 1 and 2 hours. Duffy testified that he had no knowledge about celiac disease, what it is, or what its side effects are. Duffy testified that there were certain trigger points and that it was a diagnosis of exclusion. Duffy stated, "you eliminate other possibilities, and I believe, if, you hate to say it falls into that category, but they - they diagnosed the problems that don't fall under any other diagnosis but that." *Duffy Deposition*, at 23. Duffy further knew that in order to obtain a diagnosis of fibromyalgia, " . . . the claimant goes to doctor, and the doctor performs certain tests and -- and goes under the medical criteria and comes up with the diagnosis."

In support of her claim, the Plaintiff submitted a Physician' Report of Disability, noting that the Plaintiff's symptoms included generalized muscle pain, fatigue, insomnia, and joint pain in her back and hips. Although the Plaintiff was not diagnosed with fibromyalgia prior to the effective date of her insurance coverage, Dr. Bostick conceded that "many of the symptoms that she had at that time [July 1, 2002 – September 30, 2002], ultimately as time progressed, could have actually been considered fibromyalgia." *Bostick Deposition*, at 19. *Accord, id.* at 21 ("Unfortunately, the symptoms she had … meets a lot of the things that go on with fibromyalgia.").

Dr. Bostick seemed to attribute the Plaintiff's pre-insurance symptoms to her Celiac Disease. *Bostick Deposition*, at 19 ("I thought we were dealing with her Celiac's Disease…." (Emphasis added.)); *Id.* at 20 ("[It] looked more like a viral illness with just her Celiac's

7

Disease…. (Emphasis added.)); *Id.* ("She was having some what appeared to be what you have flu like symptoms at that point." (Emphasis added.)); *Id.* at 21 ("I thought it was more the symptoms of Celiac Disease with a viral illness…." (Emphasis added.)); *Id.* at 23 ("[M]y presumptive point was that this seemed to be more Celiac Sprue or Disease and that she had a viral illness on top of it…." (Emphasis added.)); *Id.* at 32 ("[It] could have been just a flare of Celiac [Disease] with her viral illness that could have caused all her symptoms." (Emphasis added.)).   In a letter dated August 20, 2003, Dr. Bostick stated that the plaintiff's symptoms now are different than those he witnessed during these visits.   He describes her current symptoms as new, and attributes most of the plaintiff's previous symptoms to a viral illness. *Bostick Letter of August 20, 2003*, at 1.

Dr. Bostick admitted that, due to the extensive overlap of symptoms between Celiac Disease and fibromyalgia, reasonable doctors could certainly differ as to when the Plaintiff's fibromyalgia symptoms first manifested themselves.   *Bostick Deposition*, at 19, 56-57. Indeed, Doctor Bostick testified:

> Q      Would you agree with me that reasonable medical opinions could differ on when the symptoms of fibromyalgia first manifested themselves with respect to this patient?
>
> ***
>
> A      The symptoms the patient had could be from numerous things.  So it would be hard to tell you when one thing started and one thing was causing it or which was causing what at what point I think in her.  She – if – say this: I have fibromyalgia and Celiac Sprue Disease.  Many of the symptoms are – they overlap so much it would be hard to say which is what.
>
> Q      Okay.  So you would agree with me then that doctors could differ –
>
> ***

8

Q        -- on what – on when they believe the symptoms of fibromyalgia first manifested themselves as to a diagnosis of fibromyalgia now solely?

A        I'm sure that there could be differing opinions.

*Bostick Deposition*, at 56-57.  *Accord, Id.* at 19 ("And many of the symptoms that she had at that time [July 1, 2002 – September 30, 2002], ultimately as time progressed, could have been actually considered fibromyalgia.").

Duffy denied Schaffer's claim based upon the pre-existing condition clause found within the policy.  Duffy concluded that Schaffer had received care (consultation) for her disabling condition during the pre-existing period. The pre-existing clause reads as follows:

**WHAT DISABILITIES ARE NOT COVERED UNDER YOUR PLAN?**

Your plan does not cover any disabilities caused by, contributed to by, or resulting from your:  . . . pre-existing condition.

**WHAT IS A PRE-EXISTING CONDITION?**

You have a pre-existing condition when you apply for coverage when you first become eligible if:

- you received medical treatment, consultation, care or services including diagnostic measures, or took prescribed drugs or medicines in the 3 months[3] just prior to the effective date of your coverage; or you had symptoms for which an ordinary, prudent person would have consulted a health care provider in the 3 months just prior to the effective date of your coverage; and the disability begins in the first 12 months after your effective date of coverage.

Plaintiff admitted that she received a copy of the Policy booklet.  Because the Plaintiff's disability claim was filed within the first 12 months of her insurance coverage, Unum conducted an investigation to determine whether the Policy's pre-existing exclusion barred

---

[3] The 3-month pre-existing period of exclusion would have been from July 1, 2002 through September 30, 2002.

the Plaintiff's claims.  During Unum's investigation, the Plaintiff initially denied seeking any

medical treatment during the three months preceding the effective date of her insurance (July

— September 2002).

After obtaining the Plaintiff's medical records, however, Unum discovered that the

Plaintiff had, indeed, been treated for fatigue, body aches, and difficulty sleeping during the

months, and, in fact, years, preceding her insurance coverage.  Dr. Daniel Krell, a member

of Unum's medical staff, reviewed the available medical data and concluded:

> There is evidence of consult, treatment, care of services for fibromyalgia during the
> time frame of 07/01/02 to 09/30/02[.]
>
> During an office visit 9/13/02, the claimant reported severe fatigue, intermittent pain,
> chronic back pain and left hip pain.  She also reported that many days she could not
> get to work due to fatigue and had disordered sleep … and has to sleep extra on
> weekends due to fatigue.  These symptoms are consistent with what is being reported
> as part of the claimant's impairing condition.  Her current impairing condition
> resulted from the condition for which she received care (consultation) during the
> indicated timeframe.

*Unum Claim File*, at 308.

Duffy testified:

> The symptoms have to be related, yes.  And in — in my opinion if she went — if she
> was consulted for muscle pain, joint pain, headaches, the symptoms of fibromyalgia,
> whether they were labeled fibromyalgia or not, it would — it would be consistent —
> considered preexisting.  If I may give you an example of why I say that.  If a — if a
> person becomes pregnant and purchases the insurance and then goes out for delivery
> within the first 12 months even though that individual was not diagnosed as being
> pregnant the symptoms and the — and — and the care and the services was there.

*Duffy Deposition*, at 28. Duffy stated that he bases his opinion on whether Plaintiff suffers

from a pre-existing condition exclusively on what the physicians at Unum tell him.

Duffy advised the plaintiff that she could "appeal" within 180 days from the date of

the letter.  Duffy told Schaffer that "your written appeal should include your comments and

views of the issues, as well as any new documentation you may wish us to consider.  You should submit your written appeal to the following address." On July 10, 2003, Anita Schaffer sent a letter to Michael Duffy.  In that letter, she explained reasons for her visit to Dr. Bostick on September 13, 2002, the date that Unum based it's denial claiming Ms. Schaffer was suffering from conditions of fibromyalgia.  In her letter, she explained:

> My visit there was for flu-like symptoms including low-grade fever. Dr. Bostick attributed the sickness as part of the celiac disease that I have.  The fatigue was due to the flu and low iron levels and the elevated liver enzymes, which are caused by celiac disease. Celiac disease is now in remission due to the completely gluten-free diet.
>
> The symptoms I experienced in September of 2002 were completely different from the fibromyalgia pain that I started experiencing in December of 2002, which still exist.  Fibromyalgia pain is very different from anything I have ever experienced. The pain is so very extreme and severe. The first time I experienced it, I felt I was have (sic) a heart attack.  My husband had to rush me to the emergency room. Fibromyalgia also causes extreme stiffness including difficulty getting up out of a chair or out of car. It is very difficult to get out of bed and move in the mornings.  It takes several hours to be able to move about without extreme pain. Those are not the symptoms I experienced in September 2002.  My doctor feels that stress from teaching magnifies the fibromyalgia greatly.
>
> Just this last week, I was also diagnosed with arthritis.

Ms. Schaffer also included a letter dated July 11, 2003, from Dr. Bostick, which stated:

> Ms. Schaffer has been a patient in our practice for a long time.  On August 26, 2002 patient was seen with what appeared to be a viral illness. She had obvious viral stomatitis, was treated with anti-viral agent, Famvir.  Unfortunately, she progressed to severe fatigue, was reseen on September 13, 2002 suffering from arthralgias, myalgias, inability to sleep, consistent with the viral illness that she previously had. She suffers from celiac sprue, has had problems with exacerbations of that including fatigue and abdominal pain whenever she has had viral illnesses.  Unfortunately, she almost immediately, within the next month, developed a sinus infection which continued to give her significant problems with arthralgias, aching headache and ultimately required IM Rocephin on almost a daily basis to clear up the infection.  She ultimately never felt tremendously well and was seen at the Mayo Clinic in the spring of 2003 where she was treated and has been followed there since.
> It is felt unfortunately at this time because of the patient's arthralgias, chronic pain and chronic fatigue that she is not in a position to do any gainful employment.  She cannot seriously continue any

activity over 1-2 hours without rest.  If she pushes and does more than that than for a 24 hour period she is extremely fatigued and cannot function appropriately in any setting.  For that reason, at the present time, she is totally disabled.  The period of disability is unknown and will depend on how she responds to treatment as outlined by the doctors at the Mayo Clinic.

After receiving the reports from Schaffer and Dr. Bostick, Duffy advised Schaffer: "We have reviewed the additional information you recently sent us.  We regret this information was not sufficient to reverse our previous decision."

One of the physicians that Duffy relied on was Dr. Daniel Krell, an in-house physician at Unum.  Dr. Krell, testifying as to the pre-existing condition and causal connection, stated that under the policy that the pre-existing condition only had to "relate to" the ultimate disabling condition.  Krell admitted that he applied the "related to" language in determining that Schaffer had a pre-existing condition, and that provision (i.e. "relates to") was not part of the definition of "pre-existing" in the policy.

In his September 25, 2003 letter to Plaintiff, Duffy stated in part as follows:

> The new information does not change our previous decision that you were treated for the symptoms that have caused to or contributed to your current disability during the pre-existing time period.  Your symptoms are consistent with what is being reported as part of your impairing condition.  Since your current impairing condition resulted from the condition for which you received care (consultation) during the time period of 7/1/02 to 9/30/02, we are unable to consider benefits.

*Unum Claim File*, at 245.  Additionally, in his October 6, 2003 letter to Plaintiff in response to Plaintiff's appeal, Domenic Palleschi ("Palleschi") stated, in part:

> Based on all medical information we have in your file, it is more likely than not that the symptoms that were treated in the pre-existing period caused, contributed to or resulted in the condition (fibromyalgia) you are currently claiming disability for.  We are therefore upholding the decision to deny liability on your claim as appropriate under the terms of your policy.

*Unum Claim File*, at 311.

Duffy again advised Ms. Schaffer that if she disagreed with the decision she should appeal within 180 days of July 2, 2003, or their decision would be final.  On 8/21/03, Ms. Schaffer faxed additional medical information to Duffy, which included an additional letter from Dr. Bostick dated August 20, 2003.  Dr. Bostick advised that:

> Ms. Schaffer has asked us to review her record regarding visits that were made to this facility in September of 2002.  At this time, it was noted that she was having some arthralgias, myalgias, some soreness in the muscle, a general hurting all over with some fatigue which was limiting her ability to do things.  It was felt at that time this was most likely on the basis of a viral syndrome.  I don't think at that point that this patient actually was having the same symptoms she is having now because it was preceded by an upper respiratory infection consistent even with some cold sores on her lips that would have been indicative of a viral illness. She, unfortunately, progressed into a different set of symptoms with more specific atrophy with tender joints with profound change in her ability to do things to the point that after being seen at the Mayo Clinic with new symptoms, she was diagnosed with chronic fatigue syndrome at the Mayo Clinic.  She really wasn't having the stiffness and specific muscle and joint pain that she is having now.  It was more generalized myalgias, which is more of a viral nature.  She was treated at that time with Famvir even in an attempt to control these symptoms. If more information is needed, we will be happy to attempt to provide it.

Duffy responded by again advising Schaffer that the information was insufficient.

On September 16, 2003, Anita Schaffer filed her "appeal" with Unum.  She advised Unum:

> I would like to appeal the decision to deny my disability claim made on July 7, 2003.  I feel the decision was wrong and unjust.  As you can see from the enclosed letters, my doctors clearly state that I was not suffering from fibromyalgia until 2003.  Secondary symptoms of celiac disease are arthralgias which causes fatigue.  As you can see I was not suffering from the symptoms of fibromyalgia until 2003.  As I have explain (sic) to your company personnel, the symptoms from celiac disease are very different than those of fibromyalgia.  Please respond as soon as possible.

Included with Ms. Schaffer's appeal letter were three letters from her treating physicians.  The first letter was from Dr. Joseph Murray of the Mayo Clinic who had coordinated Ms. Schaffer's care at the clinic.  Dr. Murray's letter states as follows:

13

This note summarizes my interactions with the patient Anita Schaffer in 2002 and 2003. I saw the patient in 2002 with a diagnosis of celiac disease. This diagnosis was confirmed by biopsy and serologic testing. She was placed on a gluten-free diet; with an excellent response of her GI symptoms and confirmed by serologic and histologic improvement. She had essentially recovered from her celiac disease and became asymptomatic.

In 2003 I was asked to see the patient when she had an onset of a new disorder characterized by severe fatigue, muscle pain, and myalgias with trigger points, consistent with a diagnosis of fibromyalgia. This disease appears to be totally separate from her celiac disease, and I would base this opinion on the fact that her celiac disease had completely recovered on a gluten-free diet, to which she was still adhering. While celiac disease can be associated with other illnesses, it cannot be regarded as a cause or even related to other illnesses when they would occur long after the patient had been on appropriate treatment, and the celiac disease had recovered. I would regard these two diagnosis as entirely separate, with the diagnosis in 2002 being celiac disease and a new onset of fibromyalgia syndrome occurring in 2003.

The second letter was from Dr. Cochran, Ms. Schaffer's gastroenterologist, who wrote:

I am writing you to clarify your diagnosis and recommendations in regards to celiac sprue.

Reviewing your records, we initially diagnosed celiac sprue during endoscopy for a presentation of partial bowel obstruction on 2/12/01. Subsequently, you were placed on a gluten-free diet.

I reviewed my office notes carefully and although you do have osteoporosis (metabolic bone disease) as a consequence of the celiac sprue, we have not diagnosed fibromyalgia.

Celiac sprue [as well as any other chronic inflammatory condition of the GI tract] can produce arthralgias as a secondary event and it can produce symptoms of fatigue [as well as any other chronic inflammatory event in your body]. I would attribute your [Shaffer's] symptoms of fatigue and arthralgias could be primarily a result of celiac sprue and I did note that after your evaluation in the Mayo Clinic they were concerned that you may have an underlying situational depression [which is probably aggravated by the celiac sprue] and is under treatment as well.

In summary, after reviewing your chart, I find no evidence to substantiate a diagnosis of fibromyalgia.

The third letter was from Dr. Bostick and it was the same letter she had sent on August 20,

2003. Duffy advised Schaffer of the receipt of the three letters from Drs. Murray, Cochran

and Bostick and told her that if any additional information was needed he would advise.

On September 25, 2003, Duffy responded to Schaffer as follows:

> The new information consisted of three letters of support for generalized pain.  Dr. Cochran attributes your symptoms of fatigue to celiac spruce and possibly exacerbated by depression.  Dr. Murray stated that your pain is due to fibromyalgia[4] and Dr. Bostick states that your pain may be related to a viral illness, but offers no objective data to support this opinion.

Duffy concluded that "[t]he new information does not change our previous decision that you were treated for the symptoms that have caused to or contributed to your current disability during the pre-existing time period." Duffy then advised Schaffer that "[y]our request for review and your claim file have been sent to the Quality Performance Support Unit for completion of the appellate review."

On September 30, 2003, Schaffer's request for review was formally transferred to the "Quality Performance Support — Appeals Unit."  The case was assigned to Domenic Palleschi, a graduate of the University of Maine, with a B.S. degree in Business in 1980.  After college, Palleschi worked in retail sales as a manager for Service Merchandise and Famous Footwear.  In 1989, Palleschi went to work an insurance adjuster with Crawford & Company handling liability claims, workers' compensation, and property loss. He did not handle disability claims.  In 1998, Palleschi left Crawford & Company and joined Unum Insurance and was assigned to the "appeals unit."

Palleschi was asked to describe what he knew about celiac disease. He stated:

> A.    I really don't have a good understanding of what that is outside of the information that the medical department has provided me in the file.

---

[4] Dr. Murray stated that Plaintiff had a new disorder in 2003 characterized by severe fatigue, muscle pain or myalgias with trigger points.

Q.      Okay.  Did the medical department give you a definition of that disease or -- or provide you with some literature when you were reviewing it, or did they just tell you?

A.      I don't recall whether they gave me a definition or any additional literature outside of the reports that they issued in the file.

*Palleschi Deposition*, at 12.

When asked to describe the symptoms of celiac disease or osteoporosis, Palleschi stated, "I don't know in particular.  Again, I rely on the medical department for that type of information." *Id.* at 13.  When asked to describe what training he had received on fibromyalgia, celiac disease or osteoporosis, Palleschi stated he could not recall any specific training with regard to those conditions.  When asked about the pre-existing condition and the causal connection, Palleschi read the policy and stated as follows:

Q.      Take a look at the policy definition for "pre-existing condition," which is an exclusion under this policy.  Does the pre-existing condition that a claimant is claiming disability from have to be the same disabling condition that existed during the "pre-existing" period of exclusion?

A.      It does not have to be the very same condition.

Q.      It doesn't?

A.      It does not.

Q.      Okay, explain that.

A.      As I read the policy, the Plan does not cover any disabilities that are not caused by, contributed to by, or resulting from a pre-existing condition.  The pre-existing condition as it is defined in the policy is a condition that was treated or you received medical treatment, consultation, care or services or diagnostics or prescription drugs in the three months just prior to the effective date.  *So, it has to cause, contribute or result in the disabling condition.* But it can be the same condition, through. (emphasis supplied)

Q.      But it has to be a cause, or it can be a cause or a contributing cause?

16

A.      That's correct.

Q.      Alright.  So if it is something other than that, it may look similar, it may have similar several -- similar symptoms, but if it is not a -- if it is not the cause or the contributing cause then it is not a pre-existing condition, did I say that correctly?

A.      I think that's accurate.

*Palleschi Deposition*, at 17, 18.

When given a hypothetical example of a condition that had similar symptoms, but was not causally-related to each other, Palleschi stated, "If there is no causal connection caused by, contributed to by, or resulting in, then it would not likely be a pre-existing condition . . ."

Palleschi testified:

Q.      Okay.  And as the decision maker if there is — you know, the treating physicians are saying that this is not correct, she didn't suffer from fibromyalgia, it wasn't a contributing cause, and the in-house physicians are saying yes it is, do you place more weight on their opinion, the in-house people at Unum, than the treating physicians?

A.      I don't necessarily assess weight on the medical information.  I rely on the medical department to assess the medical information and to attribute the appropriate weight through their analysis.

Q.      All right.  So if they tell you that this is a preexisting that's what you are going with?

A.      That's not completely accurate.  I would --

Q.      Well, that's what happened in this case, didn't it, because they are the one that told you this was a pre — they were the only ones that told you this was a preexisting condition?

A.      They don't make the contractual determination of whether something is preexisting or not.  They respond to the questions that we ask which will clarify the medical issues so that I can apply the contract to it.

Q.      Well, they are the only ones that told you that the — that she received care or consultation for fibromyalgia during the preexisting period, didn't they?

17

A.      They — they provided information to me that indicated to me that — and, again, this is our medical staff provided information to me that indicated to me that the manifestations of the fibromyalgia condition were treated during the preexisting period.

Q.      And they are the only people who did that?

A.      They are the only ones who made that analysis.  I don't believe that the other physicians who were involved made that analysis until after the fact when they were asked to by Ms. Schaffer.

*Palleschi Deposition*, at 23-25.

Palleschi stated that as part of his review of the claim, he did not call the treating physicians and ask them any questions and the file reflected that none of Unum's medical professionals did either.  Palleschi did not know what the side effects or the symptoms of celiac disease were.  He testified:

Q.      Did you call her physicians up and ask them any questions?

A.      No, I did not.

Q.      Why not?

A.      I felt like the contemporaneous information that was in the file from the period in question was self-explanatory.

*Palleschi Deposition*, at 43.  When asked whether he knew that Schaffer's celiac disease was in remission between the period of July 1, 2002 and September 30, 2003[2002], he stated as follows:

Q.      Do you know if it was in remission or not?

A.      Not specifically.

*Id.*, at 48.  When he was asked whether nausea and vomiting were side effects or symptoms of fibromyalgia based upon the note of Dr. Cochran, Palleschi testified, "I do not know."  *Id.*,

at 49.

On October 6, 2003, Palleschi wrote Schaffer and informed her that:

> Based upon all the medical information we have in your file, it is more likely than not that the symptoms that were treated in the pre-existing period caused, contributed to, or resulted in the condition (fibromyalgia) that you are currently claiming disability for.  We are therefore upholding the decision to deny liability on your claim as appropriate under the terms of your policy.

In November 2003, the Plaintiff requested an additional review of her disability claims.  Unum had Dr. Woolson Doane, a different member of its medical staff, review the available medical data.  Dr. Doane concluded that:

> The signs and symptoms for which the claimant sought treatment in August and September of 2002 are the same signs and symptoms for which the claimant was diagnosed by the Mayo Clinic as consistent with fibromyalgia syndrome and for which the claimant seeks benefits ….  Although Dr. Bostick attributed the symptoms to a viral syndrome at the time he evaluated the claimant in August and September of 2002, that diagnosis is not supported in view of the failure to respond to antiviral medications, the persistence of the symptoms from August until the Mayo Clinic attributed the constellation of symptoms to the fibromyalgia syndrome, the absence of evidence of another systemic disease process that would produce such symptoms (other than anxiety and depression for which the claimant was receiving antidepressant medications during the period in question) and the evidence indicating resolution of the Celiac [Disease]  on a gluten free diet.

> * * *

> The treatment rendered for the symptoms present during the pre-existing period are the same symptoms resulting in the debilitating condition subsequently diagnosed by the Mayo Clinic as fibromyalgia syndrome.

*Unum Claim File*, at 329.

Based on Dr. Doane's conclusions and the Policy's exclusion of pre-existing conditions, Unum concluded that it appropriately denied the Plaintiff's disability claim and upheld its initial decision.

## IV.    ANALYSIS

In her Complaint, the Plaintiff claims, among other things, that Unum committed a bad faith failure to pay an insurance claim when it denied her claim for disability benefits. To succeed on a claim for bad faith failure to pay an insurance claim, the Plaintiff must prove the following:

a)      An insurance contract between the parties and a breach thereof by the Defendant;

b)      An intentional refusal to pay the insured's claim;

c)      The absence of any reasonably legitimate or arguable reason for that refusal (the absence of a debatable reason);

d)      The insurer's actual knowledge of the absence of any legitimate or arguable reason; and

e)      If the intentional failure to determine the existence of a lawful basis is relied upon, the Plaintiff must prove the insurer's intentional failure to determine whether there is a legitimate or arguable reason to refuse to pay the claim.

*Ex parte Simmons*, 791 So.2d 371, 378 (Ala. 2000) (quoting *Employees' Benefit Ass'n v. Grisset*, 732 So.2d 968 (Ala. 1998)). From these basic requirements of a bad faith claim, two distinct species of bad faith claims, "normal" and "abnormal," have emerged, with requirements (a)-(d) representing the "normal" bad faith refusal to pay and requirement (e) representing the "abnormal" bad faith failure to investigate. *Id.* at 379. "In the 'normal' bad-faith case, the plaintiff must show the absence of any reasonably legitimate or arguable reason for denial of a claim." *Singleton v. State Farm Fire & Cas. Co.*, [Ms. 1040919, Nov. 10, 2005] ___ So.2d ___, 2005 WL 3007974 (Ala. 2005). The abnormal case requires

1) intentional or reckless failure to investigate a claim, 2) intentional or reckless failure to properly subject a claim to a cognitive evaluation or review, 3) the manufacture of a debatable reason to deny a claim, or 4) reliance on an ambiguous portion of a policy as a lawful basis for denying a claim.

*Id.*

The plaintiff states that she makes only an abnormal bad faith claim.  An abnormal claim of bad faith, like a normal claim, requires more than bad judgment or negligence. *Singleton v. State Farm Fire & Cas. Co.*, 2005 WL 3007974, *2, 5 (Ala. Nov. 10, 2005) (stating that failure to comply with a claims manual "may indicate bad judgment or negligence, but more than bad judgment or negligence is required in a bad-faith action").  Bad faith "imports a dishonest purpose and means a breach of known duty, i.e., good faith and fair dealing, through some motive of self-interest or ill will."  *Singleton*, 2005 WL 3007974 at *2 (quoting *Slade*, 747 So. 2d at 303-04).  Consequently, a plaintiff alleging bad faith has a heavy burden.  *See, e.g., Shelter Mut. Ins. Co. v. Barton*, 822 So. 2d 1149, 1154 (Ala. 2001) ("The plaintiff asserting a bad-faith claim bears a heavy burden.").

The plaintiff contends: (1) that Unum did not give "proper weight" to letters written by her treating physicians; (2) that the Unum claims personnel were "poorly trained" on celiac disease and therefore had to rely on the opinions of Unum in-house physicians; and (3) that the contents of a purported "Report of the Targeted Multistate Market Conduct Examination," establish her case.

Plaintiff's contention that Unum did not give "proper weight"[5] to letters written by her treating physicians falls short of establishing bad faith.  The plaintiff cites no rule of thumb

---

5    The origin of Plaintiff's "proper weight" standard is *Aetna Life Ins. Co. v. Character*, 873 So. 2d 1075, 1079 (Ala. 2003), in which the Alabama Supreme Court stated the following: "Character argues that proper weight should have been given to the opinion of his treating physicians in considering whether Character was totally disabled for purposes of the LTD plan.  We agree."  The Court did not define "proper weight."

as to what weight "proper weight" is. Plaintiff implies that "proper weight" means "substantial weight" as required in the context of Social Security Administration disability benefits.[6] *See Plaintiff's Response* at 31, citing *Broughton v. Heckler*, 776 F.2d 960, 962 (11th Cir. 1985). This lawsuit, however, does not involve a determination of eligibility for Social Security disability benefits, and Plaintiff has provided no authority establishing that private insurers must comply with federal regulations applicable to the Social Security Administration. In fact, in the ERISA context, the United States Supreme Court has expressly rejected the argument that private insurers must follow the "treating physician rule."[7] *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825, 123 S.Ct. 1965, 1967, 155 L.Ed. 2d 1034, 1039 (2003) ("We hold that plan administrators[8] are not obligated to accord special deference to the opinions of treating physicians.").

Furthermore, and perhaps more important, the Social Security Administration denied Plaintiff's claim for disability benefits. *Schaffer Deposition*, at 34-35, 87-88. Although a

---

6     Plaintiff also states, without authority, that "'[p]roper weight' means, at a minimum, that Unum cannot ignore or give more weight than what a non-treating physician has concluded with reference to a diagnosis of exclusion, and which requires a physical examination to diagnose." (Plaintiff's Response at 31.) That statement, apart from not being cited, is difficult to follow. Plaintiff appears to contend that, at a minimum, Unum could not ignore the conclusion of a non-treating physician with respect to a diagnosis of exclusion.

7     As described by the Ninth Circuit Court of Appeals, "the rule required an administrator 'who rejects [the] opinions [of a claimant's treating physician] to come forward with specific reasons for his decision, based on substantial evidence in the record.'" Black & Decker Disability Plan v. Nord, 538 U.S. 822, 828, 123 S.Ct. 1965, 1969, 155 L.Ed. 2d 1034, 1041 (2003) (quoting Regula v. Delta Family-Care Disability Survivorship Plan, 266 F.3d 1130, 1139 (9th Cir. 2001)). In Nord, the Supreme Court vacated the Ninth Circuit's Regula decision. 538 U.S. at 829, 123 S.Ct. at 1969, 155 L.Ed. 2d at 1041.

8     Black & Decker Disability Plan v. Nord came to the Supreme Court in the context of ERISA (Employee Retirement Income Security Act, 29 U.S.C. §§ 1001-1461). 538 U.S. at 825, 123 S.Ct. at 1967, 155 L.Ed. 2d at 1039.

determination of disability under the Policy does not depend in any respect on any determination by the Social Security Administration, it is instructive to note that, even given the Social Security disability "treating physician rule," the Social Security Administration made the same disability determination that Unum made. Thus, Unum's decision is wholly consistent with the findings and conclusions of the Social Security Administration.

Next, Plaintiff contends that Unum was guilty of bad faith because the Unum claims personnel were "poorly trained" on celiac disease, had no medical background and were "completely reliant on Unum's in-house physicians." In Plaintiff's words, "[t]his demonstrates a reckless if not intentional failure to subject the Plaintiff's claim to a fair and cognitive review." The Unum claims personnel's reliance on in-house physicians for medical advice relating to Plaintiff's condition seems to be more evidence of good fait, as it shows an effort by the Unum claims personnel to determine the origin of Plaintiff's symptoms and to understand Plaintiff's medical condition through the assistance of doctors. Duffy made that point during his deposition:

> Q.      All right. But you have — but what if you have a disease that may look like other diseases? Don't you have to be able to say that you went or had symptoms which an ordinary person could have consulted a health care provider in the three months that were related — that these were fibromyalgia symptoms versus something else?
>
> A.      Yeah, that's why we — we rely on the medical staff at Unum because I wouldn't know what symptoms were and were not related to different illnesses.
>
> Q.      Okay. All right. But you agree with me then, if I understand what you just told me, that if I am disabled from the condition during the first 12 months if I went to the doctor or should have gone to the doctor for care or consultation those symptom have to be related to that disease?
>
> A.      Yes.

Q.     And therefore I — your belief is I had that disease versus anything or that medical problem in the — in the three months before the policy went in to effect versus some symptom that could be related to something else?

A.     Again, based on the medical advice that I got from the doctors.

*Duffy Deposition*, at 29-30.

That medical advice, which Duffy obtained from two Unum in-house physicians, Dr. Krell and Woolson Doane, M.D. ("Dr. Doane"), established that Plaintiff's disabling condition was a "preexisting condition" as that term is defined in the Policy. After reviewing Plaintiff's medical records and information, Dr. Doane concluded as follows:

> The signs and symptoms for which the claimant sought treatment in August and September of 2002 are the same signs and symptoms for which the claimant was diagnosed by the Mayo Clinic as consistent with fibromyalgia syndrome and for which the claimant seeks benefits as of 3/7/03.  Although Dr. Bostick attributed the symptoms to a viral syndrome at the time he evaluated the claimant in August and September of 2002, that diagnosis is not supported in view of the failure to respond to antiviral medications, the persistence of the symptoms from August until the Mayo Clinic attributed the constellation of symptoms to the fibromyalgia syndrome, the absence of evidence of another systemic disease process that would produce such symptoms (other than anxiety and depression for which the claimant was receiving antidepressant medications during the period in question) and the evidence indicating resolution of the Celiac [Disease] on a gluten free diet.

In response to the question, "[d]id conditions(s) treated during the pre-existing period cause, contribute to or result in the debilitating condition," Dr. Doane wrote the following:

> Yes.  The treatment rendered for the symptoms present during the pre-existing period are the same symptoms resulting in the debilitating condition subsequently diagnosed by the Mayo Clinic as fibromyalgia syndrome.

*See Unum Claim File*, at 329.  Thus, the reliance of Unum's claims personnel on Unum in-house physicians for medical opinions relating to Plaintiff's symptoms and medical condition is not in any way indicative of bad faith. Unum attempted to determine with accuracy the nature of Plaintiff's symptoms and medical condition.

24

Further, other evidence creates at least a question of fact as to whether the Plaintiff's claim that she was unable to work due to "extreme fatigue, body aches, and difficulty sleeping for disability benefits" is barred by the Policy's pre-existing condition exclusion which unambiguously excludes coverage for "any disabilities caused by, contributed to, or resulting from [the Plaintiff's] pre-existing condition." Specifically, the Plaintiff had an extensive history of chronic pain, fatigue, insomnia, and depression that predated, by at least two years, her disability insurance coverage under the Policy, which was not effective until October 1, 2002. While the Plaintiff's symptoms were initially attributed to her Celiac Disease, it is undisputed that the Plaintiff was successfully treating her Celiac Disease and that it has been in remission since at least July 2002.

Although her Celiac Disease was under control, the Plaintiff's pain and fatigue continued to persist. On Friday, September 13, 2002, the Plaintiff's pain and fatigue was so bad that her own doctor reported that "she probably is truly disabled and will not be able to continue gainful employment" and suggested that she consider "going ahead and filing for disability." *Unum Claim File*, Exhibit 1, at 157. *Accord, id.* at 235; *Bostick Deposition*, at 20-21, 24, 34, 36-37, 39-40, 54-55. Although the Plaintiff was not diagnosed with fibromyalgia until she visited the Mayo Clinic in March 2003, she was already considering making that visit in September 2002, *see Bostick Deposition*, at 39-40, and her own physician conceded that the Plaintiff's symptoms during the July 1, 2002 through September 30, 2002, exclusionary period "could have actually been considered fibromyalgia." *Bostick Deposition*, at 19, 21. Indeed, the Plaintiff's own physician ultimately admitted that a doctor could reasonably conclude that the Plaintiff's fibromyalgia symptoms first manifested themselves

25

prior to the effective date of her disability insurance coverage. *Id.*, at 19, 56-57.

The Plaintiff cites a purported "Report of the Targeted Multistate Market Conduct Examination," which does not mention Plaintiff or her claim, as evidence of Unum's alleged wrongdoing in this case. The purported "Report of the Targeted Multistate Market Conduct Examination" does not mention Plaintiff or her claim and does not demonstrate any relevance with respect to the particular facts and circumstances of this case. The disputed document also does not identify any of the particular claims that were examined. In short, the purported "Report of the Targeted Multistate Market Conduct Examination" does not contain any evidence of wrongdoing by Unum with respect to the particular claim for benefits that is at issue in this case. The court sees no basis for denying summary judgment based on this report.

## V.   CONCLUSION

The evidence does not indicate a "dishonest purpose" in the denial of the plaintiff's claim. Nor does it indicate "breach of known duty, i.e., good faith and fair dealing, through some motive of self-interest or ill will." There is no genuine issue of material fact and the movant is entitled o judgment as a matter of law. The motion for summary judgment is due to be GRANTED. An appropriate order will be entered.

DONE this 21st day of June, 2006.

Robert R. Armstrong, Jr.
United States Magistrate Judge

26